## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| DAVID COLLINS, on behalf of himself and all others similarly situated, Plaintiff,<br><br>v.<br><br>THE TOLEDO BLADE COMPANY, Defendant. | Case No. 3:23-cv-302<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**I.      INTRODUCTION**

1.      This case arises from Defendant The Toledo Blade Company's surreptitious disclosure of its subscribers' personally identifying information in violation of the Video Privacy Protection Act (the "VPPA"), 18 U.S.C. § 2710.

2.      Specifically, The Blade uses a "Pixel" tracking cookie to disclose to Meta Platforms, Inc., ("Meta, formerly known as Facebook ("Facebook")) a record of its digital subscribers' identities side by side with the specific videos its digital subscribers requested or obtained. The Blade does so without their "informed, written consent." *Id.* § 2710(b)(2)(B).

3.      Plaintiff David Collins ("Plaintiff" or "Collins") is a victim of The Blade's misconduct.  The Blade disclosed to Facebook Plaintiff's personally identifiable information, including his Facebook ID ("FID"), along with the video title and the video's URL identifying each video Plaintiff requested or obtained (together, "Personal Viewing Information").  Plaintiff brings this case as a class action, seeking damages and equitable relief on behalf of himself and all others similarly situated.

**II.     PARTIES**

4.      Plaintiff David Collins is a subscriber to The Blade who resides in Toledo, Ohio.

5. Defendant The Toledo Blade Company ("The Blade" or "Defendant") is an Ohio corporation with its principal place of business in Toledo, Ohio. Its headquarters is located at 541 North Superior Street, Toledo, Ohio 43660. Defendant owns and publishes The Blade, also known as the Toledo Blade, a Toledo-based newspaper that publishes a print edition as well as a daily online edition available on its website. The Blade offers users of its website the option to sign up for a newsletter or otherwise create an account or purchase a subscription. The Blade's site offers a selection of viewable media, including pre-recorded videos.

**III. JURISDICTION AND VENUE**

6. This Court has personal jurisdiction over The Blade because it is incorporated and has its principal place of business in Ohio.

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

8. Venue is proper in this Court because The Blade resides in this District.

**IV. FACTUAL ALLEGATIONS**

    **A. Background of the VPPA**

9. The VPPA generally prohibits the knowing disclosure of information which identifies a consumer as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(b)(1).

10. Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per violation), punitive damages, equitable relief and reasonable attorneys' fees and other reasonably incurred litigation costs. *Id.* § 2710(c)(2).

11. The VPPA was initially passed in 1988 to protect the privacy of individuals' and their families' video rental, purchase, and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and

others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

12.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id*. at 7-8.

13.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information and the need to protect it from disclosure inspired the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

14.     These statements rang true in 1988 when Congress passed the VPPA, and even more so today, in the modern era of data mining and online video content in which most Americans partake. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy

and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

15.     In this case, Defendant chose to deprive Plaintiff and class members of their rights under the VPPA by systematically disclosing their Personal Viewing Information to Facebook.

**B.     The Blade embedded the Pixel on its websites, thereby knowingly disclosing its subscribers' personal viewing information to Facebook.**

16.     The Blade intentionally deploys the "Meta Pixel" or "Pixel" on its website to send subscribers' personally identifiable information to Facebook.

### 1.     The Meta Pixel Tracker

17.     Facebook introduced its Pixel tracking tool in 2013 to allow online businesses like The Blade to track the actions of their customers on their respective websites and to build detailed, valuable profiles about them.[2] Once activated, the Meta Pixel "tracks the people and type of actions they take,[3] including each page users' visit, what buttons they click, as well as specific information that users input into a website.[4]

18.     Facebook warns companies installing the Pixel on their websites that the Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[5]

19.     Once a company like The Blade has installed the Meta Pixel on its website, the Meta Pixel tracks users as they navigate through the website and logs a variety of information, including

---

[1] *See* Statement of the Honorable Patrick Leahy, United States Senator, January 31, 2012, https://www.judiciary.senate.gov/imo/media/doc/leahy_statement_01_31_12.pdf (last visited February 3, 2023).
[2] https://developers.facebook.com/docs/meta-pixel/.
[3] https://www.facebook.com/business/goals/retargeting.
[4] https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[5] https://developers.facebook.com/docs/meta-pixel/get-started.

pages visited, any website "buttons" they click, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[6]

20.    During the installation process, The Blade chose certain options from a menu of available "events" that track specific user activity on The Blade's website for automatic disclosure to Meta, including personally identifiable information such as a user's name, email, phone number, and as relevant here, the FID, a unique and persistent identifier Facebook assigns to each Facebook user. The Blade chose for its website to disclose to Facebook its subscribers' unencrypted FIDs within a "c_user cookie."

21.    Any ordinary person who has access to this FID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile, as well as the specific video content the user requested on The Blade's website. One simply needs to log into Facebook, and type www.facebook.com/FID/ to identify the user. For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

22.    The Blade could easily program its website to not disclose this information to Facebook.

**2.    The Blade uses the Meta Pixel to disclose digital subscribers' PII from The Blade website to Facebook.**

23.    The Blade embedded the Meta Pixel on its website to disclose its subscribers' identities and video viewing histories to Meta.

---

[6] https://developers.facebook.com/docs/meta-pixel/.



24.    In the example above, user "John Roe" is requesting or obtaining Defendant's video titled "Last edition of Cheap Easts visits Focaccia's: Mary Bilyeu talks with Ed Beczynski, owner of Focaccia's Deli in downtown Toledo, about his mother's recipe for Latkes for Cheap Eats, the series that finds the best dining deals for $10 and under."[7]

25.    Once the user requests or obtains the video, The Blade sends the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID to Facebook in a single transmission.  This information is available to any website user simply by right clicking on a webpage, selecting "inspect," and clicking on the "Network" tab.

26.    The FID is displayed in the "c_user" code.   In this example, the code is 100089934521623.  The disclosure of the FID is coupled with the title of the video the subscriber

---

[7] For purposes of demonstrating in this complaint The Blade's practice of disclosing consumers' personally identifying information, Plaintiff created and used an exemplary account for "John Roe."

requested    or    obtained    along    with    the    URL    for    the    video:





**Video Name:**



**Digital Subscriber's FID:**



27.     In addition, Facebook has developed and made accessible to the public a tool called Meta Pixel Helper (the "Helper") that shows in real time whether a particular webpage has activated the Meta Pixel and, if so, what data the beacon is collecting and disclosing.  Here, the Helper confirms that the information that Defendant transmits to Facebook the video's URL and video title:



28.    Any person can specifically identify the user requesting or obtaining the "Last edition of Cheap Easts visits Focaccia's: Mary Bilyeu talks with Ed Beczynski, owner of Focaccia's Deli in downtown Toledo, about his mother's recipe for Latkes for Cheap Eats, the series that finds the best dining deals for $10 and under" video by simply entering facebook.com/100089934521623 into their search bar.  On pressing enter, John Roe's Facebook page automatically appears.



29.    The Blade violates the VPPA by knowingly disclosing subscribers' FIDs, together with the video content they requested or obtained, to Facebook.

**C.** **The Blade does not obtain consent from its various digital subscribers to disclose their personal viewing information to Meta.**

30.     When opening an account, Defendant does not inform its digital subscribers that their Personal Viewing Information and FID will be shared with Facebook, and Defendant does not ask its digital subscribers to consent to such information sharing.

31.     As is the case at the time of registration, digital subscribers are not provided with any notification that their Personal Viewing Information is being shared when they log-in to their The Blade account and request or obtain videos. Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

32.     Defendant does not seek or obtain its digital subscribers' consent (in writing or otherwise) before surreptitiously disclosing their Personal Viewing Information to Facebook.

**D.** **Plaintiff's Experience**

33.     Plaintiff David Collins has been a subscriber to The Blade at all relevant times. Plaintiff became a digital subscriber to The Blade by registering for an account and providing, among other information, his name and email address to The Blade.

34.     At all times relevant hereto, Plaintiff had a Facebook account.  Plaintiff has requested or obtained videos on The Blade's website.

35.     The Blade disclosed to Facebook Plaintiff's  FID coupled with the title of the videos he requested or obtained and the URLs to access those videos.

36.     Each time The Blade disclosed Plaintiff's PII to Facebook, it violated his rights under the VPPA.

37.     Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means

of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless disclosed Plaintiff's Personal Viewing Information to Facebook.

**V.      CLASS ACTION ALLEGATIONS**

38.     Plaintiff brings this lawsuit pursuant to FED. R. CIV. P. 23 on behalf of the following class:

> All persons in the United States who subscribed to The Blade, requested or obtained video content on The Blade's website, and who used Facebook during the time the Pixel was active on The Blade's website.

39.     The "Class Period" is from February 16, 2021 to the present.

40.     Excluded from the Class are: (a) The Blade and its employees, officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

41.     *Numerosity.* The Class is so numerous that individual joinder is impracticable. The Blade has tens of thousands of subscribers using The Blade website. On information and belief, The Blade disclosed the personal viewing information of all of those subscribers  to Facebook. The Class therefore contains thousands of class members—far too many for individual joinder.

42.     *Typicality.* Plaintiff's claims are typical of the Class he seeks to represent. Plaintiff, like all class members, had his personal viewing information knowingly disclosed to Facebook by The Blade without his informed written consent. Plaintiff's claims arise out of the same conduct and are based on the same legal theories as those of any absent class members.

43.     *Adequacy of Class Representative.* Plaintiff will fairly and adequately protect the interests of the Class. He is aware of his duties to absent class members and is determined to faithfully

discharge his responsibility. Plaintiff's interests are aligned with (and not antagonistic to) the interests of the Class.

44.    *Adequacy of Counsel.* In addition, Plaintiff has retained competent counsel with considerable experience in privacy class actions and other complex litigation. Plaintiff's counsel has done substantial work in identifying and investigating potential claims in this action, have considerable knowledge of the applicable law, and will devote the time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Class.

45.    *Commonality and Predominance.* This case presents numerous questions of law and fact with answers common to the Class that predominate over questions affecting only individual class members. Those common questions include:

a.    Whether Defendant disclosed class members' Personal Viewing Information to Facebook;

b.    Whether Defendant's disclosure of class members' Personal Viewing Information to Facebook was knowing under the VPPA;

c.    Whether the information disclosed to Facebook concerning class members' Personal Viewing Information constitutes personally-identifiable information under the VPPA; and

d.    Whether class members are entitled to compensatory damages and equitable relief as a result of Defendant's conduct.

46.    *Superiority and Manageability.* A class action is superior to individual adjudications because joinder of all class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount-in-controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

47.    *Injunctive Relief*. Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

48.    *Particular Issues*. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). His claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## FRAUDULENT CONCEALMENT AND TOLLING

49.    The applicable statutes of limitations are tolled by virtue of Defendant's knowing and active concealment of the facts alleged above. Plaintiff and class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

50.    At the time the action was filed, Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff and the class. Defendant is therefore estopped from relying on any statute of limitations.

51.    Defendant's fraudulent concealment is common to the class.

## CAUSE OF ACTION

### COUNT I
### Violations of the Video Privacy Protection Act,
### 18 U.S.C. § 2710

52.    Plaintiff incorporates by reference all of the above allegations.

53.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710(b)(1).

54.     A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." *Id.* § 2710(a)(4).  Defendant is a "video tape service provider" because it is engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

55.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff and class members are subscribers to Defendant's service of providing video content. Thus, Plaintiff and class members are "consumers" under this definition.

56.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

57.     The Blade knowingly disclosed Plaintiff's and class members' PII—specifically, their FIDs and the title and URL of the videos they requested or obtained—to Facebook.

58.     This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each class member to Facebook as an individual who requested or obtained Defendant's video content, including the specific video materials requested or obtained on Defendant's website. Indeed, anyone with an FID could identify the individual associated with it simply by entering "facebook.com/[FID]" into a web browser.

59.     Under the VPPA, "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer,

whichever is sooner." *Id.* § 2710(b)(2)(B). Defendant failed to obtain informed, written consent under this definition.

60.    In addition, the VPPA creates an opt-out right for consumers. *Id.* § 2710(2)(B)(iii). It requires video tape service providers like The Blade to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." *Id.* Defendant failed to provide an opportunity to opt out as required by the VPPA.

61.    Defendant knowingly disclosed Plaintiff's and class members' Personal Viewing Information to Facebook.  Defendant programmed the Facebook Pixel into its website code, knowing that Facebook would receive video titles and the subscriber's FID when a subscriber requested or obtained a video.

62.    By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the class members' statutorily protected right to privacy in their video-watching habits.

63.    As a result of the above violations, Defendant is liable to the Plaintiff and other class members for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages" "not less than $2,500" per violation. *Id.* § 2710(c)(2). Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future. *Id.*

## **PRAYER FOR RELIEF**

64.    Plaintiff, individually and on behalf of all others similarly situated, hereby requests that the Court:

        a.    Certify this case as a class action;

b.     Appoint Plaintiff as Class representative and appoint Plaintiff's counsel to represent the Class;

c.     Find that Defendant's actions, as described herein, constitute violations of the VPPA;

d.     Award actual damages or liquidated damages in an amount not less than $2,500 for each violation to Plaintiff and each class member;

e.     Award punitive damages in an amount to be determined at trial;

f.     Award reasonable attorneys' fees and reimbursement of litigation expenses;

g.     Award Plaintiff and class members pre- and post-judgment interest as provided by law;

h.     Enter judgment in favor of Plaintiff and the Class;

i.     Enjoin Defendant's ongoing misconduct, enter any equitable relief it deems appropriate, and awards restitution in an amount sufficient to disgorge Defendant's ill-gotten gains; and

j.     Enter any other relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

65.     Plaintiff demands a jury trial on all applicable claims.

Dated: February 16, 2023      Respectfully submitted,


By: */s/ Jared W. Connors*         

Matthew R. Wilson
Michael J. Boyle, Jr.
Jared W. Connors
MEYER WILSON CO., LPA
305 W. Nationwide Blvd.
Columbus, Ohio 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066
mwilson@meyerwilson.com
mboyle@meyerwilson.com
jconnors@meyerwilson.com

Brian Levin
LEVIN LAW, P.A.
2665 South Bayshore Drive, PH2b
Miami, FL 33133
(305) 402-9050
(305) 676-4443
brian@levinlawpa.com

Don Bivens
DON BIVENS, PLLC
15169 N. Scottsdale Rd, Suite 205
Scottsdale, AZ 85254
don@donbivens.com

*Attorneys for Plaintiff and the Proposed Class*