IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

David Collins, *et al*.,                                        Case No. 23-cv-00302

        Plaintiffs,

       v.                                                    **ORDER**

The Toledo Blade, *et al.*,

        Defendants.

    This is a Video Privacy Protection Act putative class action case under 18 U.S.C. § 2710 ("VPPA"). Defendants are the Toledo Blade Company, PG Publishing Co., and Block Communications, Inc. (Doc. 17. PgID. 88).

    Defendants Toledo Blade and PG Publishing Co. own and publish local newspapers the *Toledo Blade* and the *Pittsburgh Post-Gazette*, respectively. (Doc. 18-1, PgID. 119). The *Toledo Blade* and the *Post-Gazette* are local newspapers serving Toledo, Ohio and Pittsburgh, Pennsylvania, respectively. (*Id.*) Toledo Blade is an operating division of Defendant Block Communications (*id.*) and PG Publishing is a wholly-owned subsidiary of Defendant Block Communications (*id*).

    Plaintiffs are David Collins, Patricia Fuire, Elizabeth Mayforth, and Robert Annan. Plaintiffs are registered users of the *Toledo Blade's* website, www.toledoblade.com, or the *Post-Gazette's* website, www.post-gazette.com. (Doc. 17, PageID. 98–101). Plaintiffs allege that Defendants illegally shared a record containing their digital subscribers' identity plus titles of videos they accessed on Defendants' websites with non-party Meta Platforms, Inc. (*Id.* at PageID. 88).

On October 31, 2023, Defendants filed a motion to dismiss Plaintiffs' second amended complaint ("Complaint"). (Doc. 18). On November 20, 2023, Plaintiffs responded (Doc. 19), and on December 15, 2023, Defendants filed a reply (Doc. 20).

For the reasons that follow, I deny Defendants' motion.

## **Background**

## **1. Factual Background**

The *Toledo Blade* and the *Post-Gazette* offer print and online editions of their respective newspapers on their websites, www.toledoblade.com and www.post-gazette.com.  (Doc. 17 at PgID. 89–90). Both websites contain pre-recorded and live-stream videos. (*Id*. at PgID. 92).

Defendants offer users of their websites the option to create an account or purchase a subscription. (*Id*. at PgID. 90). Plaintiffs allege that they were all digital subscribers to the *Toledo Blade* or the *Post-Gazette*. (*Id*.).

Plaintiffs registered for accounts on both newspapers' websites by providing, among other information, their names and email addresses. (*Id*. at PgID. 98–101). In exchange, the newspapers provided Plaintiffs with unique usernames and passwords for their websites. (*Id*.)

Plaintiffs allege that they all regularly requested or obtained video materials from Defendants' websites. (*Id*.).

Plaintiffs are also Facebook users. (*Id*. at PgID. 88, 98–101). They created Facebook accounts by providing Facebook with their name, email or phone number, and other information such as date of birth and gender. *See* www.facebook.com/help (Mar. 12, 2024) [https://perma.cc/C2RY-YA3J]. Facebook assigns each of its users a unique identification number, or Facebook ID ("FID"). (*Id*. at PgID. 93).

Facebook associates its users' FID with that individual's Facebook profile and URL.[1, 2] (*Id.*) Each of the four named Plaintiffs have a unique FID associated with their profiles. (*Id*. at PgID. 98–101).

In 2021, Facebook rebranded as Meta Platforms, Inc. *See* https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ (Mar. 12, 2024) [https://perma.cc/2F24-7C88]. Among other products, Meta offers its customers a business tracking tool called the Meta Pixel. *Id*. Meta's website explains that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website." https://www.facebook.com/business/help (follow "About Meta Pixel" hyperlink) (Mar. 12, 2024).

Defendants voluntarily installed the Meta Pixel tracking tool on their websites. (Doc. 17, PgID. 92–93). Using Meta Pixel, the *Toledo Blade* and the *Post-Gazette* kept track of when Plaintiffs accessed a video on Defendants' websites. (*Id*.).

Defendants then sent Meta a "cookie"[3] containing the file names of the videos Plaintiffs accessed, along with their associated FIDs. (*Id*.).

Plaintiffs allege that each time Defendants sent this information to Meta, Defendants violated Plaintiffs' rights under the VPPA.

---

[1] "URL" is short for "Uniform Resource Locator." It is, essentially, a web address that directs a browser to a website.

[2] Plaintiffs give an example of this in their Complaint where they state that Facebook founder Mark Zukerberg's FID is the number "4". (*Id*.). Thus, typing the URL www.facebook.com/4 into a web browser retrieves Zukerberg's unique Facebook profile page. (*Id*. at PgID. 93–94).

[3] Meta defines "cookies" as "small pieces of text used to store information on web browsers. Cookies are used to store and receive identifiers and other information on computers, phones and other devices. Other technologies, including data that we store on your web browser or device, identifiers associated with your device and other software, are used for similar purposes." https://www.facebook.com/privacy/policies/cookies/ (Mar. 12, 2024) [https://perma.cc/9Z3W-YLLH].

## 2.  The VPPA

The VPPA provides that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1).

The First Circuit has explained Congress' historical reasons for enacting the VPPA:

> Congress enacted the VPPA in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C., newspaper during his confirmation hearings. S. Rep. No. 100–599, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342–1. The profile contained a list of 146 films that Judge Bork and his family had rented from a video store. *Id*. Members of Congress denounced the disclosure as repugnant to the right of privacy. *Id*. at 5–8. Congress then passed the VPPA "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id*. at 1.

*Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016).

The VPPA defines a "video tape service provider" as "any person, engaged in the business … of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

Personally identifiable information ("PII") is "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id*. at § 2710(a)(3).

Under the VPPA, "consumer" is "any renter, purchaser, or subscriber of goods or services from any video tape service provider." *Id*. at § 2710(a)(1).

The VPPA "is not well drafted" legislation. *Rodriguez v. Sony Comput. Ent. Am. LLC*, 801 F.3d 1045 (9th Cir. 2015); *and see Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012). Simply put, the VPPA is an "attempt to place a square peg (modern electronic technology) into a round hole (a statute written in 1988 aimed principally at videotape rental services)." *Yershov*

4

*v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 140 (D. Mass. 2015), *rev'd on other grounds*.[4]

### **Legal Standard**

### 1. **Rule 12(b)(1)**

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

A facial attack "questions [ ] the sufficiency of the pleading." *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016). "When reviewing a facial attack, a district court takes the allegations in the complaint as true." *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015) (quoting *Gentek*, *supra*, 491 F.3d at 330).

"If those allegations establish federal claims, jurisdiction exists." *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009). But "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Rote*, *supra*, 816 F.3d at 387 (quoting *O'Bryan*, 556 F.3d at 376). "This approach is identical to the approach used by the district court when reviewing a motion invoking Federal Rule of Civil Procedure 12(b)(6)." *Glob. Tech., Inc.*, *supra*, 807 F.3d at 810.

A factual attack, by contrast, "raises a factual controversy requiring the district court to 'weigh the conflicting evidence to arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist.'" *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017)

---

[4] Congress revisited the statute in 2012–13. However, it did not change or update the key definitions set forth above. Rather, it modified only those provisions in the statute addressing how a customer can consent to disclosure of their own PII. *See, In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 284–90 (3d Cir. 2016) (discussing legislative history of the VPPA).

(*overruled on other grounds by Freed v. Thomas*, 81 F.4th 655 (6th Cir. 2023)). In a factual attack on subject matter jurisdiction, "no presumptive truthfulness applies to the factual allegations," *Gentek*, *supra*, 491 F.3d at 330, and "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

 "In considering a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, a district court may consider factual matters outside the pleadings and resolve factual disputes." *Anestis v. United States*, 749 F.3d 520, 524 (6th Cir. 2014); *see also Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (stating that the court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts").

When a court's subject-matter jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden to prove jurisdiction. *Glob. Tech., Inc.*, *supra*, 07 F.3d at 810 ("[T]he party invoking federal jurisdiction has the burden to prove that jurisdiction.").

## 2.  Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), I decide whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). This statement must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, *supra*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

6

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

<u>**Discussion**</u>

**1.  Subject Matter Jurisdiction**

Defendants first argue that Plaintiffs lack a cognizable Article III injury under the VPPA. (Doc. 18-1, PgID. 124–127). Defendants identify that they are making a factual challenge to Plaintiffs' standing; specifically, that Plaintiffs have not suffered an injury in fact.  (Doc. 18-1, PgID. 124).

To establish Article III standing, a plaintiff must allege three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, … and (b) "actual or imminent, not 'conjectural or hypothetical.'" … Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." … Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted).

The Supreme Court clarified in *TransUnion LLC v. Ramirez*, that "an injury in law is not an injury in fact." 594 U.S. 413, 427 (2021). In other words, to establish a concrete injury, the plaintiff must identify an injury, that is, a "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* Some examples of intangible injuries, recognized as a basis for lawsuits, are "reputational harm [and] disclosure of private information" *Id.* at 425.

The conclusion that plaintiffs have "suffered a concrete injury for purposes of Article III standing to assert a VPPA claim is supported by every federal circuit court that has considered the

issue." *Feldman v. Star Tribune Media Co. LLC*, 659 F. Supp. 3d 1006, 1015 (D. Minn. 2023) (collecting cases). The outcome here is no different.

Significantly, it is well-established that disclosure alone constitutes an injury under the VPPA:

> The VPPA plainly provides those, […], who allege wrongful disclosure even without additional injury a right to relief. By affording redress to "aggrieved" "consumers" and providing that "consumers" become "aggrieved" purely as a result of disclosures made in violation of the statute, the VPPA makes clear that such disclosures alone work an injury deserving of judicial relief.

*Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp.3d 962, 966 (S.D.N.Y. 2015) (citations omitted).

In support of their argument, Defendants submit a declaration from Junsu Choi, a Principal at Keystone Strategy, which is a "consulting firm that specializes in the application of technological methodologies and principles to questions that arise in a variety of contexts, including, as here, in the context of litigation." [5] (Doc. 18-3, PgID. 141).

Mr. Choi's declaration explains that there are two types of videos on the *Toledo Blade* and *Post-Gazette's* websites: embedded videos and standalone videos. He states: "An embedded video refers to a webpage that contains a video that is embedded within an article. By contrast, a standalone video refers to a webpage that contains a video and a short description of that video (usually a single sentence or caption), and no other content." (Doc. 18-3, PgID. 143).

For his analysis, Mr. Choi used technology known as Man-In-The-Middle ("MITM") to intercept the cookies sent from the *Toledo Blade* and *Post-Gazette* to Meta. (*Id*. at PgID. 142). Mr. Choi attached screenshots of the MITM information to his affidavit. (*See id.* at PgID. 148–215).

---

[5] Plaintiffs expend many pages in their opposition arguing why I should disregard Mr. Choi's declaration and discredit it. (Doc. 19, PgID. 226–234). I reject Plaintiffs' arguments. As explained above, Defendants are making a factual attack and, accordingly, I can consider extrinsic evidence to resolve factual disputes. *See Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003).

For embedded videos, Mr. Choi avers that the file name of the video is not included in the cookies Defendant sends Meta. (*Id*. at PgID. 144). He explains that, also, the cookies do not contain information such as whether a user "played, requested, or otherwise interacted" with the video. (*Id*.).

As to standalone videos, Mr. Choi avers that the name of the video file is included in only about half of the cookies sent to Meta. (*Id*. at PgID.146). And as with the embedded video cookies, none of the standalone video cookies disclose whether a user "played, requested, or otherwise interacted" with a video. (*Id*.).

In sum, Mr. Choi's declaration indicates that the only time that Defendants send Meta the file name of a video and the user's FID is when the video is the standalone type; not the embedded type. And even then, the file name is only in some of the cookies sent to Meta, not all of them.

Significantly, however, his affidavit confirms that even if a video *file name* is not included in all the cookies Defendants send to Meta, the *URL* for the webpage containing the video is disclosed, along with the user's FID. Accordingly, Mr. Choi's declaration does not contradict Plaintiffs' allegations that Defendants disclosed the fact that Plaintiffs visited a URL containing a video and Plaintiffs' FID to Meta.

Defendants argue that because the cookies transmitted to Meta do not indicate how or whether the user "interacted with a video on that webpage," such as if it was "in fact watched or requested," Plaintiffs have not sufficiently alleged that Defendants unlawfully shared VPPA-protected information with Meta. (Doc. 20, PgID. 325).

Again, I disagree. There is nothing in the statute that indicates that a plaintiff must show that they watched or "interacted with" a video. Rather, the VPPA states only that "a video tape service provider who knowingly discloses… personally identifiable information concerning any consumer

of such provider shall be liable." *See* 18 U.S.C. § 2710. Though not the basis of my decision, it seems reasonable to presume that a glimpse at a video, however brief, is sufficient.

Here, Plaintiffs have alleged that Defendants knowingly disclosed to Meta the fact that Plaintiffs accessed a webpage containing a video, along with the Plaintiffs' FID. Mr. Choi's declaration confirms this is so. Plaintiffs have therefore alleged that they suffered an injury in fact.[6]

## 2.  Failure to State a Claim

Next, Defendants argue that Plaintiffs fail to state a claim under the VPPA. (Doc. 18-1, PgID. 127–135). Defendants argue: (1) that Plaintiffs are not "consumers" within the meaning of the VPPA; (2) that Defendants are not "video tape service providers" within the meaning of the VPPA; and (3) to the extent the information transmitted constitutes PII, it falls under the VPPA's ordinary course of business exception. (Doc. 18-1, PgID. 127–135).

### Consumer

The VPPA defines "Consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

Here, Plaintiffs allege that they provided their names and email addresses to Defendants and, in exchange, Defendants allowed access to more of Defendants' online newspaper content.[7] (*See* Doc. 17, PgID. 89–90).

---

[6] This is consistent with the plain language, and indeed, also the historical context, of the VPPA. As discussed, the VPPA was enacted well-before the regular use of current video-streaming technology. The titles of the 146 films that Robert Bork and his family rented from the video store, which prompted Congress to enact this law, were just that: the titles affiliated with his video store account. In Bork's case, there was no information about whether he actually watched all of the videos he and his family rented. Similarly here, Plaintiffs have established that the *Toledo Blade* and the *Post-Gazette* send Meta the URL for the webpage Plaintiffs visit plus their unique FID. In some cases, the *Toledo Blade* and *Post-Gazette* send the video's file name also. This suffices.

[7] Defendants provided an affidavit of their employee, Nathan Mason, which I mention here only for further context and not because I am converting this motion to dismiss into one for summary

The parties agree that Plaintiffs are not renters or purchasers, so I will analyze whether this adequately alleges that they are "subscribers."

The VPPA does not define "subscriber." The Sixth Circuit has not addressed this issue. Several other circuits have done so, and I look to them here for guidance.

The First Circuit stated, when confronted with this identical issue: "Because [the VPPA] contains no definition of the term 'subscriber,' nor any clear indication that Congress had a specific definition in mind, we assume that the 'plain and ordinary meaning' of the word applies." *Yershov*, *supra*, 820 F.3d at 487.

The *Yershov* Court explained:

> All dictionaries appear to be clear that a "subscriber" is one who subscribes. *See, e.g.*, Merriam–Webster's Collegiate Dictionary 1244 (11th ed. 2012). As for the meaning of the word "subscribe" itself, the dictionaries provide us with various choices. As the first relevant definition of "subscribe," Merriam–Webster provides "to enter one's name for a publication or service." *Id.* More on point technologically, another dictionary defines "subscribe" as "[t]o receive or be allowed to access electronic texts or services by subscription" with "subscription" defined, in turn, to include "[a]n agreement to receive or be given access to electronic texts or services." The American Heritage Dictionary 1726 (4th ed. 2000).

*Id*.

The Eleventh Circuit has set forth a multi-factor test for determining whether someone is a subscriber. The factors include: "payment, registration, commitment, delivery, expressed association, and/or access to restricted content." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251,

---

judgment. *See Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007). (Doc. 18-2).

Mr. Mason explains that, since at least 2013, Defendants' website users "have had unlimited free access to every standalone video on post-gazette.com and toledoblade.com." (Doc. 18-2, PgID 139). However, as to embedded videos, he explains, "a user will eventually hit a paywall after viewing a certain number per month. That amount resets every month." (*Id.*). Thus, by creating an account or subscribing, Plaintiffs bypass the restrictions on embedded video content. (*See* Doc. 18-1, PgID. 122).

1256 (11th Cir. 2015). None of the factors on their own are dispositive. *Id*.; *and see Harris v. Public Broadcasting Service*, 662 F. Supp. 3d 1327, 1331 (N.D. Ga 2023).

Defendants cite to recent decisions where courts refused to find that plaintiffs who signed up for a defendant's online newsletter or email list were "subscribers" under the VPPA. (*Id*. at PgID. 128 (citing *Carter v. Scripps Networks, LLC*, No. 22-cv-2031, 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023); *Ellis, supra*, 803 F.3d at 1257–58; *and Jefferson v. Healthline Media, Inc*., No. 22-cv-05059, 2023 WL 3668522 (N.D. Cal. May 24, 2023)). In other words, "not everything that might be labeled a 'subscription' automatically triggers the statute's protections." (*Id*. (citing *Jefferson, supra*, 2023 WL 3668522 at *3)).

Those cases finding that a plaintiff is not a "subscriber" are distinguishable from the facts presented here. For example, in *Carter, supra*, 2023 WL 3061858, the plaintiffs contended they were "subscribers" because they signed up to receive a periodic emailed newsletter from hgtv.com. The plaintiffs never alleged that they signed up for an account directly with hgtv.com to fully access the website's content. Rather, their "subscription" to a newsletter was ancillary to hgtv.com's full website. Accordingly, they found that the plaintiffs were not "subscribers" to the hgtv.com website.

The Court in *Salazar v. Paramount Global*, No. 22-00756, 2023 WL 4611819 (M.D. Tenn. Julu 18, 2023), which is the only other district court case in the Sixth Circuit to analyze this issue, reached the same conclusion as *Carter* and presented similar facts. The plaintiff in *Salazar* signed up to receive the defendant's online newsletter—which was ancillary to the products and services offered by the defendant itself. *Id*. The plaintiff did not allege, for example, that he could "only" access video content on Defendant's website by signing up for the defendant's newsletter. *Id*.

Here, there is no "newsletter" ancillary to Defendants' main product. Plaintiffs gave Defendants their contact information in exchange for the very material that is, writ large, Defendants' main business: news and journalism. Defendants offer their users access to this information in the format of both written articles and audio-visual videos. Videos are not secondary or ancillary; they are just another format Defendants use to provide news and informational content to users.

I find that Plaintiffs are subscribers to Defendants for the same reasons that the district court in the Northern District of Georgia found that the plaintiffs there were subscribers to PBS in *Harris*, *supra*, 662 F. Supp. 3d 1327, 1331–32 (N.D. Ga. 2023). There, the plaintiff signed up for a free account with pbs.org, which required her to provide PBS with her name, email address, and other information. The plaintiff also was a Facebook user. She discovered that PBS configured its website to contain Meta Pixel, and was sending Meta data files that included a log of the video content that she accessed on pbs.org. In other words, the facts in *Harris* are nearly identical to the facts here.

The *Harris* court found that the plaintiff's relationship with PBS was "stronger" than those in other cases where the plaintiff merely signed up to receive a periodic newsletter or email. The *Harris* plaintiff had "established an account" directly with the defendant to access even "restricted" content that the defendant offered on its website. This is the same relationship that Plaintiff alleges here.

For these reasons, I find that Plaintiffs are "subscribers" within the plain meaning of that term.

**Video Tape Service Provider**

Defendants next argue that they are not "video tape service providers" within the meaning of the VPPA. As discussed, the VPPA defines a "video tape service provider" as "any person,

13

engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" 28 U.S.C. § 2710(a)(4).

The parties do not dispute that this case does not involve video cassette tape rental or sale. (*See* Docs. 18-1, 19). Therefore, I must determine whether Plaintiffs have adequately alleged that Defendants are engaged in the business of delivery of audio visual materials. I find that they are.

Defendants revisit many of the same arguments made already namely, that delivery of digital videos is "ancillary" to their main business. (Doc. 18-1, PgID. 130–133). Defendants argue that the fact that they might be "peripherally or passively" involved in delivering video content to Plaintiffs does not mean they are video tape service providers under the VPPA. (*Id*. at PgID. 131). Again, the Sixth Circuit has not addressed this issue; though other circuit courts have.

Defendants are "local newspapers that publish print and online editions. … Their primary business function is to deliver written news articles." (*Id*. at PgID. 132). Defendants acknowledge that "[v]ideos are available" on their website. (*Id*.). Though, they emphasize, video content is only a "small minority of toledoblade.com and post-gazette.com's webpages," and any videos are "largely below-the-fold and embedded in news articles." (*Id*.)

Defendants argue that if I were to include them in the VPPA's definition of a video tape service provider, this "would sweep nearly all online and digital content providers that offer any video content whatsoever into the VPPA's scope." (*Id*.).

The problem for Defendants is that the plain language of the statute requires only that Defendants are engaged in the business of "delivery" of "audio visual materials." It does not distinguish "peripheral or passive" delivery. Instead, it requires only that Defendants engage in the delivery of audio visual materials, which Defendants concede they do.

14

Defendants cite to several cases where a district court refused to find that the defendant was a video tape service provider. For example, Defendants cite to *Carroll v. General Mills, Inc.*, No. 23-1746, 2023 WL 4361093 (C.D. Cal. June 26, 2023). In that case, the defendant General Mills maintained a website for its brands that offered videos that consumers could view. It maintained that the purpose of these videos was to "increase its brand presence." *Id*. at *1. The plaintiff, who was also a Facebook accountholder, viewed a video on the defendant's website. *Id*. The defendant then sent Meta a cookie indicating the plaintiff viewed or accessed the video on its website. *Id*. The plaintiff sued the defendant for violating the VPPA.

The district court granted the defendant's motion to dismiss on the basis that, for the defendant to be 'engaged in the business' of delivering video content, **the defendant's product** must not only be **substantially involved in the conveyance of video content** to consumers but also **significantly tailored to serve that purpose**." *Id*. at *3 (emphasis in original) (quoting *In re Vizio, Inc.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017)). The district court emphasized that there were "few allegations" in the complaint regarding the defendant's business, that such allegations were "conclusory and, at most, indicate that General Mills provides videos as a peripheral part of its marketing strategy." *Id*. The court concluded that the websites were not "the key components of the brands," nor were they the defendant's "particular field of endeavor." *Id*. at *4. The court concluded: "Nothing suggests that Defendant's business is centered, tailored, or focused around providing and delivering audiovisual content." *Id*.

The Sixth Circuit has not adopted this reading of the statute. Indeed, it has not addressed the issue at all. I am therefore not obligated to apply an analysis that narrows the definition of a video tape service provider beyond its plain meaning to one who is "substantially involved in the conveyance of video content to consumers." *Id*.

15

Even so, Plaintiffs have alleged, and Defendants have acknowledged, that Defendants are in the business of delivering news and journalism to the public, and that they format this content in both the written word and video. At least at the motion to dismiss stage, these allegations are sufficient.

Accordingly, I reject Defendants' argument that they are not video tape service providers under the VPPA.

### Ordinary Course of Business Exception

Last, Defendants argue that the disclosure Plaintiffs complain of is "incident to the ordinary course of business" under the VPPA's safe harbor provision. (Doc. 18-1, PgID. 133; (citing 18 U.S.C. § 2710(b)(2)).

The VPPA permits a video tape service provider to disclose personally identifiable information to the following: (A) the customer him/herself; (B) to any person with the "informed written consent" of the customer; (C) to a law enforcement agency under a warrant; (D) if the disclosure is "for the exclusive use of marketing goods and services directly to the customer" and the customer had an opportunity to first prohibit the disclosure; (E) "to any person if the disclosure is incident to the ordinary course of business of the video tape service provider; or (F) pursuant to a court order. *See* 18 U.S.C. § 2710(b)(2) (A)–(F).

The only disclosure exception that Defendants argue applies here is the "ordinary course of business" exception. They urge me to find that the "ordinary course of business" encompasses advertising, which, they argue, is the "[m]odern day analogue of marketing activity long protected by the VPPA." (Doc. 18-1, PgID. 133–134). The Sixth Circuit has not weighed in on this issue.

I reject Defendants' argument for several reasons.

16

First, Congress already addressed marketing in a separate subsection—Subsection (D). If Congress intended to include "marketing" in Subsection (E) where it discussed the "ordinary course of business," then it would have done so, and perhaps would not have also addressed "marketing" in its own subsection.

Second, the few courts that have interpreted the "ordinary course of business" exception to include marketing are distinguishable from the facts alleged here. For example, in *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618 (7th Cir. 2014), the Seventh Circuit found that the defendant, Redbox, provided another company, Stream Global Services, with personal information regarding its customers. *Id*. The reason it did so was because Redbox outsourced its customer service support to Stream Global. The court considered customer service a function of business operations normally performed by a company itself. *Id*. And, accordingly, this disclosure fell within the "ordinary course of business" exception. *Id*.

The facts of *Redbox* are not comparable to the facts here. Defendants do not offer any argument that Meta performed some function of Defendants' business, such as customer service or a similar function, that would normally be performed by Defendants themselves. I am not persuaded by Defendants' circular argument that they outsourced their advertising or marketing functions to Meta to perform on Defendants' behalf; rather, the facts alleged at the pleading stage do not show that Defendants shared Plaintiffs' PII with Meta for Meta to perform advertising and marketing, or any other function on Defendants' behalf.

Next, I reject Defendants' argument interpreting *Daniel v. Cantrell*, 375 F.3d 377 (6th Cir. 2004). (Doc. 20, PgID. 332). In *Daniel*, the plaintiff, in a separate criminal case, pleaded guilty to the sexually molesting three children. *Id*. at 379. Part of his criminal scheme was showing his

17

victims pornographic videos. *Id*. When law enforcement began investigating the plaintiff's crimes, it obtained a list of his video rental records. *Id*.

After pleading guilty, the plaintiff brought a *pro se* complaint against various video stores and its employees, along with several of the victims' parents, for violating the VPPA. *Id*. at 379–380. The victims' parents moved to dismiss the plaintiff's complaint on the basis that the parents were not video tape service providers under the VPPA. *Id*. The court granted the motion in the parents' favor and the plaintiff appealed. On appeal, the Sixth Circuit concluded that the parents were not proper parties. *Id*. at 381.

In *dicta*, the Court stated that "the defendants may only be [video tape service provider]s if personal information was disclosed to them under subparagraph (D) or (E) of subsection (b)(2)" of the VPPA. It found that neither would apply.

For a disclosure to fall under subparagraph (D), it must be "for the exclusive use of marketing goods and services directly to the consumer." *Id*. at 382. However, since the purpose of the disclosure in *Daniel* was a criminal investigation, the Court found subparagraph D "is inapplicable in this case." *Id*.

The Court next observed, "[the plaintiff] properly does not argue that the disclosure falls within subparagraph (E)." Yet, the Court noted, if the plaintiff had done so, it would apply "ordinary course of business" narrowly:

> Subparagraph (E) applies only to disclosures made "incident to the ordinary course of business" of the [video tape service provider]. *Id*. at § 2710(b)(2)(E). The term "ordinary course of business" is "narrowly defined" in the statute to mean "only debt collection activities, order fulfillment, request processing, and the transfer of ownership." *Id*. at § 2710(a)(2); *see also* S.Rep. No. 100–599 at 14 (1988), reprinted in 1988 U.S.C.C.A.N. 4342 (noting that the term is "narrowly defined" in the statute). "Order fulfillment" and "request processing" are defined in the legislative history as the use, by [video tape service provider]s, of "mailing houses, warehouses, computer services, and similar companies for marketing to their customers." S.Rep. No. 100–599 at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N.

18

4342. Daniel presents no evidence suggesting that his information was disclosed as a result of any of these activities. The disclosure in this case seems to have been made in conjunction with a criminal investigation, which is not included on the list of disclosures made "in the ordinary course of business."

*Daniel*, *supra*, 375 F.3d at 382.

In other words, the Sixth Circuit would define "ordinary course of business exception" as "only debt collection activities, order fulfillment, request processing, and the transfer of ownership." *Id*. None of these terms include "marketing." This is the portion of *Daniel* that Defendants rely upon where they urge me to find that the "ordinary course exception" applies here. Clearly, it does not.

Accordingly, I reject Defendants' argument that the disclosures are protected by the "ordinary course of business" exception to the VPPA.

### Conclusion

In sum, I conclude that Plaintiffs: (1) have standing; and (2) state a claim under the VPPA. I reject the Defendants' arguments that Plaintiffs are not consumers, that Defendants are not video tape service providers, and that the disclosures are protected under the "ordinary course of business" exception to the VPPA.

Accordingly, it is hereby,

ORDERED THAT:

1. Defendants' motion to dismiss under Rules 12(b)(1) and/or 12(b)(6) be, and hereby is, denied (Doc. 18); and

2. The Court will forthwith set a status/scheduling conference.

SO ORDERED.

*/s/ James G. Carr*

Sr. U.S. District Judge